*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

COLBY DELEA MARTIN,

        Defendant-Appellant.

UNPUBLISHED
July 23, 2026
2:00 PM

No.  367173
Van Buren Circuit Court
LC No.  2022-023726-FC

Before:  MARIANI, P.J., and O'BRIEN and WALLACE, JJ.

PER CURIAM.

Following a jury trial, defendant was convicted of first-degree premeditated murder, MCL 750.316(1)(a); failure to stop at the scene of an accident causing death, MCL 257.617(3); and concealing the death of an individual, MCL 333.2841(3).  The trial court sentenced defendant to life imprisonment without parole for the murder conviction; 86 months to 15 years' imprisonment for failing to stop at the scene of an accident causing death; and 24 months to 5 years' imprisonment for concealing the death of an individual.  Defendant now appeals as of right. We affirm.

## I.  INTRODUCTION AND GENERAL OVERVIEW

Defendant's convictions arise out of events that occurred on September 20 and September 21, 2021 in both St. Joseph and Van Buren Counties.  At approximately 8:15 a.m. on September 20, 2021, the 65-year-old victim set out on her regular morning run-walk from the resort campground where she had stayed the summer with her husband.  When the victim did not return at the expected time, her husband became concerned, called her cell, drove his truck along her regular route, and then called the police.  Through a series of search warrants, law enforcement obtained the victim's cell phone data and tracked the victim's cell phone for a period of time.  At a certain point, however, the Subscriber Identity Module (SIM) card was apparently removed from the victim's phone and briefly placed in a Samsung cell phone associated with defendant.  The police then tracked this phone and discovered defendant, on the morning of September 21, 2021, sleeping in his truck in a Walmart parking lot.  Shortly thereafter, defendant directed law enforcement to the victim's half-naked body in an isolated area in Three Rivers State Game Area.

-1-

The prosecution's case was based on the theory that defendant fantasized about having sex with a corpse or unconscious woman; and that on the morning of September 20, 2021, he intentionally struck and killed the victim with his truck, then placed her lifeless body in his vehicle and, after he fulfilled his fantasy in the hours that followed, defendant dumped the victim's body in a remote area of a state park.[1]  By contrast, defendant argued to the jury that the victim's death was an accident and that his actions after the accident were borne out of fear and panic.  Defendant denied that he engaged in any sexual acts with the victim's corpse.  There were no eyewitnesses to any of the events and much of the prosecution's case was circumstantial and built on expert testimony from an accident reconstructionist, forensic scientists, and experts in cell phone extraction and mapping.  As indicated, at the close of proofs, the jury found defendant guilty of, among other things, first-degree premeditated murder.

## II.  ANALYSIS OF THE ISSUES

### A.  MOTION IN LIMINE—MRE 404

Defendant first argues that the trial court abused its discretion by admitting other-acts evidence under MRE 404(b), specifically evidence relating to his internet search history.  There was evidence that, in the months leading up to the victim's death, defendant searched for pornography related to necrophilia and sexual contact with unconscious or incapacitated women.  On the morning of September 20, 2021, before his encounter with the victim, defendant searched the internet for tranquilizer guns.  There was also evidence that for several hours after the victim's death, while her lifeless body was still in his truck, defendant accessed pornography on his cell phone, including using his credit card to pay for live interactions with naked women.  Defendant maintains that the evidence was not relevant to establishing the permitted purposes for admitting the other-acts evidence cited by the prosecution in its MRE 404(b)(3) notice: "motive, opportunity, intent, preparation, scheme or plan and lack of accident/mistake."  We disagree and find the trial court's admission of this evidence was not an abuse of discretion.

"To preserve an evidentiary issue for review, a party opposing the admission of evidence must object at trial and specify the same ground for objection that it asserts on appeal." *People v Thorpe*, 504 Mich 230, 252; 934 NW2d 693 (2019), citing MRE 103(a)(1).  "A party's pretrial motion in limine is sufficient to preserve a claim of evidentiary error." *People v Jones*, ___ Mich App ___, ___; ___ NW3d ___ (2025) (Docket No. 362854); slip op at 3.

This Court reviews for an abuse of discretion a trial court's decision to admit or exclude evidence. *Thorpe*, 504 Mich at 251.  "A trial court abuses its discretion when it selects an outcome that does not fall within the range of reasonable and principled outcomes." *People v Snyder*, 301 Mich App 99, 104; 835 NW2d 608 (2013) (quotation marks and citation omitted).  "Preliminary issues of law, including the interpretation of the rules of evidence and the effect of constitutional

---

[1] The state park was actually Three Rivers State Game Area located on Purgatory Road.  However, defendant, in his statement to police, referred to this area as "Purgatory State Park."  Several witnesses adopted this nomenclature.

provisions, are reviewed de novo." *People v Benton*, 294 Mich App 191, 195; 817 NW2d 599 (2011).

Defendant challenges the admission of other-acts evidence under MRE 404(b)(1),[2] which, at the time of the trial court's rulings, stated:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, scheme, plan, or system in doing an act, knowledge, identity, or absence of mistake or accident when the same is material, whether such other crimes, wrongs, or acts are contemporaneous with, or prior or subsequent to the conduct at issue in the case.

MRE 404(b) does not prohibit all other-acts evidence simply because the evidence may implicate character. "MRE 404(b) is a rule of inclusion, meaning it permits the admission of any logically relevant evidence '*even if* it also reflects on a defendant's character,' so long as the evidence is not 'relevant *solely* to the defendant's character or criminal propensity.' " *People v Spaulding*, 332 Mich App 638, 649; 957 NW2d 843 (2020), quoting *People v Mardlin*, 487 Mich 609, 615-616; 790 NW2d 607 (2010). Thus, other-acts evidence may be admissible if (1) the evidence is offered for a proper purpose, (2) the evidence is relevant, and (3) the danger of unfair prejudice does not substantially outweigh its probative value. *People v Denson*, 500 Mich 385, 398; 902 NW2d 306 (2017). See also *People v VanderVliet*, 444 Mich 52, 55, 63-65; 508 NW2d 114 (1993), mod 445 Mich 1205 (1994).

"Under the first prong of the *VanderVliet* test, the question is whether the prosecution has articulated a proper noncharacter purpose for admission of the other-acts evidence." *Denson*, 500 Mich at 398. The list of proper purposes set forth in MRE 404(b)(1) is not exhaustive. *Mardlin*, 487 Mich at 615. As noted, the prosecution cited motive, opportunity, intent, preparation, scheme, plan, absence of mistake, and lack of accident as proper noncharacter purposes for admission of the evidence. This recitation satisfies the first prong of the *VanderVliet* test.

Under the second prong of the *VanderVliet* test, the evidence must be relevant. Logical relevance is determined by the application of MRE 401 and MRE 402. *Denson*, 500 Mich at 400. Pursuant to MRE 401, "relevant evidence" means "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." MRE 402 provides: "All relevant evidence is admissible, except as otherwise provided by the Constitution of the United States, the Constitution of the State of Michigan, these rules, or other rules adopted by the Supreme Court. Evidence which is not relevant is not admissible."

---

[2] Substantial amendments to the Michigan Rules of Evidence went into effect on January 1, 2024. See 512 Mich lxiii (2023). This opinion will cite to the versions of the rules in effect at the time of the trial court's decisions.

Defendant was charged with open murder. At the conclusion of defendant's trial, the trial court instructed the jury on the elements of the crimes of first-degree premeditated murder, second-degree murder, and involuntary manslaughter. Defendant was convicted of first-degree premediated murder, which includes "[m]urder perpetrated by means of poison, lying in wait, or any other willful, deliberate, and premeditated killing." MCL 750.316(1)(a). "[T]he elements of first-degree premeditated murder are: (1) the intentional killing of a human; (2) with premeditation and deliberation." *People v Oros*, 502 Mich 229, 240; 917 NW2d 559 (2018) (quotations marks and citation omitted). Regarding premeditation and deliberation, the Michigan Supreme Court has stated that "to premeditate is to think about beforehand; to deliberate is to measure and evaluate the major facets of a choice or problem." *Id.* at 240 (brackets, quotation marks and citation omitted).

With regard to the second element of the *VanderVliet* test, we likewise conclude that the trial court did not abuse its discretion when ruling that the evidence was both material and probative under MRE 401 and MRE 402 with regard to the evidence preceding his encounter with the victim. The prosecution asserts that evidence that defendant accessed pornographic material preceding his encounter with the victim was relevant to establish motive. "Although motive is not an essential element of the crime, evidence of motive in a prosecution for murder is always relevant. In cases in which the proofs are circumstantial, evidence of motive is particularly relevant." *People v Unger*, 278 Mich App 210, 223; 749 NW2d 272 (2008) (citation omitted). *People v Hoffman*, 225 Mich App 103, 106; 570 NW2d 146 (1997), defined "motive," for the purposes of MRE 404(b), as: "Cause or reason that moves the will and induces action. An inducement, or that which leads or tempts the mind to induce a criminal act." (Quotation marks and citation omitted.) In the law, motive is distinct from intent. " 'Motive' is the moving power which impels to action for a definite result. Intent is the purpose to use a particular means to effect such result." *Id*. (quotation marks and citation omitted). In this case, the prosecutor contended that defendant killed the victim because he fantasized about having sex with a dead or incapacitated woman. Considering the charges against defendant, his accessing pornographic material related to necrophilia and sex acts with incapacitated women was relevant to establishing that defendant struck the victim with his vehicle with the intent to kill her and motive to fulfill his fantasy. In short, the evidence preceding his encounter with the victim was logically relevant for a proper purpose under MRE 404(b).

We likewise find that the evidence of defendant purportedly watching pornography after striking the victim with his truck, including paid online live cameras with naked women, was logically relevant to showing absence of mistake and lack of accident because it is utterly incongruous that someone who accidentally struck and killed a pedestrian, who acting out of fear and panic made off with the body to hide it and cover up their negligence (as defendant stated to

the police and testified), would be watching pornography (including paid live interactions with naked women on their cell phone) in the process of doing so.[3]

Regarding the third element of the *VanderVliet* test, the probative value of the evidence both before and after striking the victim with his truck was not substantially outweighed by the danger of unfair prejudice for purposes of MRE 403. This rule of evidence provides that the court may exclude relevant evidence if "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." "Unfair prejudice may exist where there is a danger that the evidence will be given undue or preemptive weight by the jury or where it would be inequitable to allow use of the evidence." *People v Blackston*, 481 Mich 451, 462; 751 NW2d 408 (2008). "All evidence offered by the parties is 'prejudicial' to some extent, but the fear of prejudice does not generally render the evidence inadmissible. It is only when the probative value is *substantially outweighed* by the danger of unfair prejudice that evidence is excluded." *People v Mills*, 450 Mich 61, 75; 537 NW2d 909 (1995), mod 450 Mich 1212 (1995).

In this case, as stated, considering the prosecution's theory, the pornography evidence and internet searches preceding his encounter with the victim were probative of defendant's motive and intent. Indeed, this evidence was the only way by which the prosecution could establish defendant's motive and his intent to kill the victim. Likewise, the pornography evidence, including paid live interactions with naked women on camera, from after defendant struck the victim with his truck, was probative of demonstrating absence of mistake and lack of accident, undercutting his defense that he struck the victim with his truck accidentally and then made off with her body to hide it in the state park out of panic and fear. As such, the probative value was not substantially outweighed by the danger of unfair prejudice. It should also be noted that, for the most part, the jury was only exposed to a general description of the pornography defendant accessed on the internet. Although some of the videos that were saved on defendant's phone were played for the jury, these videos were edited, and the nudity and sexual acts were blurred out. Thus, the trial court limited the prejudicial effect of the evidence. Further, the trial court also instructed the jury on the proper use of other-acts evidence, which further alleviated any prejudice. *People v Petri*, 279 Mich App 407, 414; 760 NW2d 882 (2008) ("Jurors are presumed to follow instructions, and instructions are presumed to cure most errors."); *People v McGhee*, 268 Mich App 600, 621; 709 NW2d 595 (2005) (finding that even where MRE 404(b) evidence is erroneously admitted, a

---

[3] Even if we accepted defendant's argument that the post-collision cell phone evidence was not logically relevant to a proper MRE 404(b) purpose, we would nonetheless find that any such error was harmless and would not have affected the outcome. The harmless-error standard presumes that a preserved evidentiary error is not a ground for reversal unless, after an examination of the entire cause, it affirmatively appears that it is more probable than not that the error was outcome determinative. *People v Lukity*, 460 Mich 484, 495-496; 596 NW2d 607 (1999). In this case, there was *overwhelming* evidence of defendant's guilt, and the post-collision cell phone evidence was merely cumulative of his similar pre-collision conduct. Therefore, any error in admitting the post-collision cell phone evidence was not outcome determinative. See *id*.

limiting instruction reduces the "jury's reliance on the evidence"). On this record, there was no basis to exclude the evidence under MRE 403.

In conjunction with his MRE 404(b) argument, defendant asserts that the trial court abused its discretion when it admitted evidence that handcuffs, cords, unused condoms, an open condom, a mini baseball bat, scissors, a bottle of testosterone booster, and a bottle of smelling salts were found in defendant's truck. This evidence does not implicate MRE 404(b) because mere possession of such items is not "[e]vidence of other crimes, wrongs, or acts" and is not the type of evidence that, in general, suggests bad character that would give rise to an improper propensity inference. See *People v Crawford*, 458 Mich 376, 384; 582 NW2d 785 (1998) ("Underlying the rule is the fear that a jury will convict the defendant inferentially on the basis of his bad character rather than because he is guilty beyond a reasonable doubt of the crime charged."). Instead, the items found in defendant's truck constituted circumstantial evidence of his premeditation and deliberation, i.e., his preparation for running down the victim with his truck and the unlawful sexual conduct that followed, especially when considered in their totality along with his necrophilia and sex-with-incapacitated-women pornographic internet search history, and DNA evidence linking him to the victim. Indeed, there was evidence from which the jury could conclude that defendant used the scissors to cut off the victim's shorts and underwear and that he used the condoms when he engaged in sexual conduct with the victim's dead body. The trial court did not abuse its discretion when it admitted testimony and other evidence related to the items found in defendant's vehicle.

## B. EXPERT TESTIMONY

Defendant presents a twofold argument with regard to challenging the expert testimony of the pathologist, Dr. Joseph Prahlow. Defendant appears to argue that the trial court erred in admitting the testimony because the witness's opinions were unreliable. In a related argument, defendant argues that trial counsel's performance was deficient because he failed to file a discovery demand. Defendant reasons that had trial counsel sought discovery, he would have been aware that the pathologist who performed the autopsy on the victim had changed his opinion regarding the manner of death. We find no merit in these arguments.

Generally, "[t]o preserve an evidentiary issue for review a party opposing the admission of evidence must object at trial and specify the same ground for objection that it asserts on appeal." *Thorpe*, 504 Mich at 252. Although slightly out of context, defendant did object to the medical examiner testifying that his opinions may change if given additional information. Consequently, this issue is sufficiently preserved for appellate review.

A claim of ineffective assistance of counsel is preserved by moving for a new trial or *Ginther*[4] hearing in the lower court. See *People v Payne*, 285 Mich App 181, 188; 774 NW2d 714 (2009). Defendant filed a postjudgment motion in the lower court, and requested a *Ginther* hearing, however, the request for an evidentiary hearing was not based on the same grounds that defendant asserts on appeal. In the lower court, defendant requested a *Ginther* hearing to further

---

[4] *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973).

explore whether trial counsel was ineffective for failing to communicate to him an alleged plea offer. Thus, defendant's claim of ineffective assistance of counsel is not preserved for appellate review. Accordingly, this Court's review of this claim is limited to errors apparent on the record. *People v Abcumby-Blair*, 335 Mich App 210, 227; 966 NW2d 437 (2020).

Dr. Prahlow testified that he performed his autopsy on the victim on September 22, 2021. After receiving toxicology results, he finalized his autopsy report on October 30, 2021. Dr. Prahlow testified that, based on the evidence he had at the time, he concluded that the victim died from multiple blunt force injuries and that her manner of death was accidental.

In the autopsy report, Dr. Prahlow included the following:

> Although the circumstances related to moving the body from the scene of the collision are suspicious and worrisome, it is my opinion that the lethal injuries present at the autopsy are consistent with having occurred at the scene of the collision. As such, as with most motor vehicle versus pedestrian collisions, the manner of death in this case is considered an accident. Should any information be forthcoming that suggests the collision was intentional, an amended report may be issued.

At trial, Dr. Prahlow testified that it would be common to amend his reports if he received more information, particularly if he received more information that would affect his opinion regarding the cause of death. In this regard, Dr. Prahlow testified that a couple of weeks earlier, during a call from the prosecutor advising him that he would be called to testify, he learned of additional information related to the case. Dr. Prahlow then testified, "So, based on what I heard in kind of summary form, I may well amend the manner of death in this case but I'm waiting to receive additional police reports, investigative reports, et cetera, et cetera from various offices before I make that determination." Dr. Prahlow testified that he had not received any additional reports but had been told verbally about the results of crash reconstruction and DNA and body fluid testing.

Later during Dr. Prahlow's testimony, defendant objected to the prosecution's questions regarding the effects of smelling salts or herbal testosterone pills on a person. Defense counsel argued that there was no evidence that smelling salts were used on the victim and that the defense had never been provided a written report that included an opinion regarding the effects of these items. In response, the prosecution noted that defendant had notice because during discovery, defendant was provided pictures of the items found in defendant's truck. The trial court overruled defendant's objection and permitted Dr. Prahlow to testify regarding these two items seized from defendant's truck. The court found that the expected testimony was relevant to prove intent, premeditation, and deliberation. The court also noted that, because defendant apparently had never filed a discovery request in the case, the prosecution had no obligation to provide the defense with additional information, stating: "I don't see a discovery request which would have necessitated that this expert's opinion be on this basis be [sic] provided to the defense." Thereafter, Dr. Prahlow testified that, in general, smelling salts were used to revive, or attempt to revive, someone who had passed out. On cross-examination, Dr. Prahlow agreed that smelling salts were likewise used by athletes to get an extra boost and to keep people awake at work.

Defendant argues that Dr. Prahlow's expert testimony was inadmissible under MRE 702. We disagree. At the time the court considered the admissibility of the testimony, MRE 702 provided:

> If the court determines that scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise if (1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods of reliable to the facts of the case.

"A court considering whether to admit expert testimony under MRE 702 acts as a gatekeeper and has a fundamental duty to ensure that the proffered expert testimony is both relevant and reliable." *People v Lemons,* 514 Mich 485, 504; 22 NW3d 42 (2024) (quotation marks and citation omitted).

Defendant does not argue that Dr. Prahlow was unqualified as an expert under MRE 702. Similarly, he does not challenge Dr. Prahlow's findings regarding the injuries the victim sustained as a consequence of being struck by defendant's truck or that she died from blunt force trauma. Indeed, defendant does not take issue with Dr. Prahlow's initial opinion that the manner of death was accidental. Instead, defendant argues that Dr. Prahlow's testimony was unreliable because Dr. Prahlow was "permitted to disavow his own report and expert opinion and inform the jury that his report would be amended if and when" he received additional reports from the investigation. First, it should be noted that defendant has misrepresented the record. Dr. Prahlow did not disavow his initial report. He simply qualified his opinion, noting that it was based on the information he had at that time. Nor did Dr. Prahlow inform the jury that he would be changing his opinion. Instead, the doctor testified that he may amend the manner of death in the autopsy report if, after being provided additional information, such an amendment were warranted. In any event, defendant is not actually challenging Dr. Prahlow's opinions as unreliable, he is challenging the pathologist's yet-to-be-formed opinion. This is an insufficient basis on which to find Dr. Prahlow's testimony inadmissible.

The completeness of Dr. Prahlow's opinions is a matter that could have been addressed on cross-examination. Further, defendant has provided no authority for the proposition that Dr. Prahlow's testimony was inadmissible for the reason defendant advances. Moreover, to the extent that Dr. Prahlow's findings were possibly incomplete, this is an argument that goes to the weight of the testimony, not its admissibility. See, e.g., *People v Collins*, 43 Mich App 259, 265; 204 NW2d 290 (1972). Accordingly, defendant has failed to establish that the admission of Dr. Prahlow's testimony was an abuse of discretion.

Defendant also argues that his trial counsel was ineffective because he failed to submit a discovery request prior to trial. The issue of ineffective assistance of counsel is a mixed question of fact and law. *People v Heft*, 299 Mich App 69, 80; 829 NW2d 266 (2012). There is a presumption of effective assistance of counsel, and a party claiming otherwise bears a heavy burden. *People v Putman*, 309 Mich App 240, 248; 870 NW2d 593 (2015). "To establish a claim of ineffective assistance of counsel, a defendant must show both that counsel's performance was deficient, and that counsel's deficient performance prejudiced the defense." *People v Riley (After*

*Remand)*, 468 Mich 135, 140; 659 NW2d 611 (2003), citing *Strickland v Washington*, 466 US 668, 687; 104 S Ct 2052; 80 L Ed 2d 674 (1984). "In order to demonstrate that counsel's performance was deficient, the defendant must show that it fell below an objective standard of reasonableness under prevailing professional norms. In so doing, the defendant must overcome a strong presumption that counsel's performance constituted sound trial strategy." *Riley*, 468 Mich at 140. Establishing prejudice necessarily requires demonstrating a reasonable probability that the result of the proceedings would have been different but for counsel's error. *People v Nix*, 301 Mich App 195, 207; 836 NW2d 224 (2013). Further, the party claiming ineffective assistance bears the burden of establishing the factual predicate for the claim. *Putman*, 309 Mich App at 248.

Although defendant identifies a singular action that he alleges was deficient, he has not discussed in any manner how he was prejudiced by this allegedly deficient representation. To establish a claim of ineffective assistance of counsel, a defendant must show both that counsel's performance was deficient, and that counsel's deficient performance prejudiced the defense. *Riley,* 468 Mich at 140. Because defendant has not addressed in any manner how he was prejudiced by the failure to submit a discovery request prior to trial, this issue has been abandoned. An appellant may not simply "announce a position or assert an error and then leave it up to this Court to discover and rationalize the basis for his claims, or unravel and elaborate for him his arguments, and then search for authority to either sustain or reject his position." *People v Kevorkian*, 248 Mich App 373, 389; 639 NW2d 291 (2001) (quotation marks and citation omitted). Even if this Court were to consider defendant's claim of ineffective assistance of counsel in this regard, there is no evidence on this record that defendant was prejudiced by the allegedly deficient representation. Establishing prejudice necessarily requires demonstrating a reasonable probability that the result of the proceeding would have been different but for counsel's error. *Nix*, 301 Mich App at 207. The prosecutor represented at trial that all the available discovery had been provided to defendant. Moreover, Dr. Prahlow testified that he had not received any additional investigatory reports and had not amended his original autopsy report. Accordingly, even if trial counsel had filed a discovery request before trial, it would not have yielded any additional information. In short, defendant has not identified anything favorable to the defense that trial counsel failed to obtain or request during discovery. On this record, defendant's ineffective assistance of counsel claim fails because he has not shown prejudice.

## C. INEFFECTIVE ASSISTANCE OF COUNSEL—INSTRUCTIONAL ERROR

Defendant also claims that trial counsel was ineffective when he failed to request a jury instruction on the basis of accident. Defendant contends that defense counsel should have requested M Crim JI 7.2. This model jury instruction provides:

> (1) The defendant says that [he/she] is not guilty of ____ because _____'s death was accidental. By this defendant means that [he/she] did not mean to kill or did not realize that what [he/she] did would probably cause a death or cause great bodily harm.

> (2) If the defendant did not mean to kill, or did not realize that what [he/she] did would probably cause a death or cause great bodily harm, then [he/she] is not guilty of murder.

The use note for M Crim JI 7.2 states that the "instruction is designed for use where the defendant acknowledges that the act was voluntary but the consequences unintended. It is meant to be used as a defense to a murder charge only."

A criminal defendant "is entitled to have a properly instructed jury consider the evidence against him." *People v Dobek*, 274 Mich App 58, 82; 732 NW2d 546 (2007). Jury instructions must therefore "include all the elements of the charged offense, and must not exclude material issues, defenses, or theories if the evidence supports them." *People v Kosik*, 303 Mich App 146, 155; 841 NW2d 906 (2013). Additionally, "[a] defendant asserting an affirmative defense must produce some evidence on all elements of the defense before the trial court is required to instruct the jury regarding the affirmative defense." *People v Guajardo*, 300 Mich App 26, 34-35; 832 NW2d 409 (2013) (quotation marks and citation omitted). "Instructional errors that directly affect a defendant's theory of defense can infringe a defendant's due process right to present a defense." *People v Leffew*, 508 Mich 625, 643; 975 NW2d 896 (2022) (quotation marks and citation omitted) However, in considering the affirmative defense of defense of others, the Michigan Supreme Court in *Leffew* advised:

> In order to properly raise the defense, the defendant has the burden of producing some evidence from which the jury can conclude that the essential elements of the defense are present.
>
> The defendant's burden is not a heavy one. Even when the supporting evidence is weak or of doubtful credibility its presence requires an instruction of the theory of defense. In short, a defendant who puts forward some evidence in support of their affirmative-defense theory is entitled to an instruction on that theory. [*Id.* at 644 (quotation marks, citations, and brackets omitted).]

Defendant's trial counsel did raise the defense of accident in his closing arguments, but opening and closing statements are not evidence. and "[s]uggesting an accident theory in an opening and closing statement does not provide the supportive evidence needed to warrant a jury instruction of the same." *Mills*, 450 Mich at 82 n 15. Further, because defendant presented no evidence in his defense, and there must be "some evidence" to support the reading of an instruction, the evidence could have only come during the prosecution's case-in-chief. In this regard, the prosecution specifically presented evidence that the killing was not accidental. Several witnesses testified that there was very little shoulder on 84th Avenue, where the victim was run down. In defendant's video statement, admitted during the prosecution's case, he stated that the victim was walking on the paved portion of the roadway. He further asserted that the woman came out of nowhere and that he struck her by accident. However, testimony from the prosecution's crash reconstructionist does not support an accident theory. Indeed, that testimony compellingly established that defendant intentionally struck the victim with his truck. Sgt. Davis testified that there was no evidence of braking on the pavement. He further determined from the cone of debris, tire-mark evidence, and the damage to the vehicle, that defendant struck the victim 10.5 to 13 feet from the north edge of the east-west roadway. Sgt. Davis also concluded that defendant did not engage his brakes until after striking the victim. Lastly, Sgt. Davis testified that defendant was driving under the posted speed limit at the time of impact. In this case, the evidence that defendant struck the victim by accident was extremely weak and was only presented through defendant's recorded statement. Nonetheless, evidence of accident was not completely absent. As noted,

-10-

evidence supporting a defense can be weak or of doubtful credibility. *Leffew*, 508 Mich at 644. Arguably, on this record, defense counsel should have requested that the trial court give M Crim JI 7.2. However, to establish a claim of ineffective assistance of counsel, a defendant must show both that counsel's performance was deficient, and that counsel's deficient performance prejudiced the defense. *Riley*, 468 Mich at 140. Based on the existing record, we conclude that defendant cannot satisfy the prejudice prong of the *Strickland* test.

Even if defense counsel should have requested that the jury be given M Crim JI 7.2, defendant cannot demonstrate a reasonable probability that the failure to instruct on the accident defense affected the outcome of the proceedings or undermined the reliability of verdict. Considering the elements of first-degree premeditated murder, the jury's decision to convict defendant of this charge specifically ruled out the possibility that the jury would have believed the accident defense.

For the accident defense to have succeeded, the jury would have to believe that defendant "did not mean to kill or did not realize that what [he] did would probably cause the death or cause great bodily harm." M Crim JI 7.2. The trial court instructed the jury regarding the elements of first-degree premeditated murder, second-degree murder, and involuntary manslaughter under a theory of gross negligence. The elements of first-degree premeditated murder are "(1) the intentional killing of a human; (2) with premeditation and deliberation." *Oros*, 502 Mich at 240. "The elements of second-degree murder are (1) a death, (2) caused by an act of the defendant (3) with malice, and (4) without justification or excuse." *People v Wafer,* 509 Mich 31, 40; 983 NW2d 315 (2022) (quotation marks and citation omitted). "Malice is defined as the intent to kill, the intent to cause great bodily harm, or the intent to do an act in wanton and willful disregard of the likelihood that the natural tendency of such behavior is to cause death or great bodily harm." *People v Baskerville*, 333 Mich App 276, 284; 963 NW2d 620 (2020) (quotation marks and citation omitted). "[F]or purposes of this case, the elements of involuntary manslaughter are (1) the defendant caused the death of another and (2) in doing the act that caused the death, the defendant was grossly negligent." *People v Fredell*, 516 Mich 1, 12; 33 NW3d 320 (2024).

In *People v Hawthorne*, 474 Mich 174; 713 NW2d 724 (2006), the Michigan Supreme Court considered a murder case involving a claim that the trial court should have instructed the jury regarding the defense of accident. The jury convicted the defendant of second-degree murder. *Id.* at 185. The Court concluded that the accident instruction should have been given, however, the Court held that reversal was not warranted because, "as the Court of Appeals explained '[t]he jury instructions explaining the intent element of murder made it clear that a finding of accident would be inconsistent with a finding that defendant possessed the intent required for murder.'" *Id.* (citation omitted; alteration in original). The Supreme Court noted that, if the jury believed the defendant lacked malice and their action resulting in the death was an accident, it would not have convicted the defendant of second-degree murder. *Id.* That is, the jury could have convicted the defendant of involuntary manslaughter but instead chose second-degree murder.

The Court's holding in *Hawthorne* is instructive. In this case, the jury was fully aware that they had to determine whether defendant had the specific intent to kill in order to convict him of first-degree premeditated murder. That intent was not consistent with defendant's actions being an accident. *Hawthorne*, 474 Mich at 185. Specifically, the jury concluded defendant intended to kill the victim when he struck her with his pickup truck. If the jury determined the death was an

accident, it would not have convicted defendant of first-degree murder. Indeed, had the jury maintained any reasonable doubt regarding whether defendant possessed the requisite intent, it could have convicted defendant of either of the lesser included offenses. The fact that it did not, is telling. Consequently, as in *Hawthorne*, even if defense counsel requested M Crim JI 7.2 as a defense to murder and the trial court gave the requested instruction, there is no reasonable likelihood that the outcome of the trial would have been different. On the facts of this case, the defendant has not met his burden of demonstrating that any alleged instructional error deprived him of the effective assistance of counsel.

## D. MOTION TO SUPPRESS

Lastly, defendant argues that the trial court should have granted his motion to suppress the statements he made during his interview in the Walmart parking lot on the morning of September 21, 2021. We disagree.

A trial court's ultimate decision whether to suppress evidence is reviewed de novo, but any underlying factual findings are reviewed for clear error. *People v Stewart*, 512 Mich 472, 480; 999 NW2d 717 (2023). Accordingly, such factual findings "will be affirmed unless we are left with a definite and firm conviction that a mistake was made." *People v Lewinski*, ___ Mich App ___, ___; ___ NW3d ___ (2026) (Docket No. 365350); slip op at 3 (quotation marks and citation omitted).

"The ultimate question whether a person was 'in custody' for purposes of *Miranda*[5] warnings is a mixed question of fact and law, which must be answered independently by the reviewing court after review de novo of the record." *People v Barritt*, 325 Mich App 556, 561; 926 NW2d 811 (2018) (quotation marks and citation omitted). This Court reviews de novo whether a statement was voluntary, with deference to the trial court's assessment of witness credibility. *People v Ryan*, 295 Mich App 388, 396; 819 NW2d 55 (2012). "To the extent that a trial court's ruling on a motion to suppress involves an interpretation of the law or the application of a constitutional standard to uncontested facts, our review is de novo." *People v Clark*, 330 Mich App 392, 415; 948 NW2d 604 (2019) (quotation marks and citation omitted).

"Both the state and federal constitutions guarantee that no person shall be compelled to be a witness against himself or herself." *People v Cortez*, 299 Mich App 679, 691; 832 NW2d 1 (2013), citing US Const, Am V, and Const 1963, art 1, § 17. To protect this right, law enforcement must first provide *Miranda* warnings to the accused before a "custodial interrogation," i.e., advising him that " 'he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed.' " *Cortez*, 299 Mich App at 691, quoting *Miranda*, 384 US at 444. "Statements made by a defendant to the police during a custodial interrogation are not admissible unless the defendant voluntarily, knowingly, and intelligently waives the constitutional right against self-incrimination." *Barritt*, 325 Mich App at 561-562.

---

[5] *Miranda v Arizona*, 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966).

To determine whether a defendant is in custody for purposes of *Miranda*, "courts consider both whether a reasonable person in the defendant's situation would believe that he or she was free to leave and whether the relevant environment presented the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*." *Cortez*, 299 Mich App at 692 (brackets, quotation marks and citation omitted; alteration in original). In this case, the parties do not dispute the trial court's determination that defendant was in custody when he made the inculpatory statement regarding the whereabouts of the victim's body. However, the parties disagree whether the police officer was interrogating defendant when he made the statement. For purposes of *Miranda*, "[i]nterrogation refers to express questioning and to any words or actions on the part of police that the police should know are reasonably likely to elicit an incriminating response from the subject." *People v Raper*, 222 Mich App 475, 479; 563 NW2d 709 (1997). "Statements made voluntarily by persons in custody do not fall within the purview of *Miranda*." *Id*. After reviewing the record, we conclude, as did the trial court, that defendant's statement regarding the location of the victim's body was spontaneous and not in response to questioning or actions by law enforcement which were reasonably likely to elicit an incriminating response.

At the hearing on defendant's motion to suppress, Det. Walker testified that his first contact with defendant was on September 21, 2021, in the Walmart parking lot. At that time, all Det. Walker knew was that there had been a "crash" and that the victim was missing. Other officers were on the scene about five minutes before Det. Walker. When he arrived, he saw at least six unmarked police cars in a corner of the parking lot. He estimated that three or four undercover officers from the Sheriff's Department and the same number of undercover, plain-clothed officers from the Michigan State Police (MSP) were present. Det. Walker noted defendant standing outside a pickup truck with front-end damage. Defendant was handcuffed, possibly behind his back. Det. Walker approached defendant, who was standing among the officers, and placed him in the front passenger seat of an unmarked MSP car, with Det. Walker getting in the driver's seat. Det. Walker indicated that he took these steps to avoid the defendant being "paraded around in this parking lot with Walmart traffic." According to Det. Walker, defendant was "pretty docile," and acting normally, not happy but not upset either. Det. Walker did not remove defendant's handcuffs and the vehicle's doors were closed.

The conversation that followed lasted maybe five minutes, but no more than 10. Initially, Det. Walker confirmed he was talking to the right person. Defendant identified himself and gave his date of birth. Det. Walker described the atmosphere in the vehicle:

> Colby and I are just carrying on general conversation. I mean he never asked me, I never asked him about what brought me here. We kept talking about his family, my family, our kids, my kids . . .

Then, Det. Walker's testimony was directed to defendant's statements having potential relevance to the investigation:

> *Q*. All right, why don't you tell me what he said that was relevant to your investigation and thoughts that maybe Colby had more information to tell you.
>
> *A*. Sure. I was explaining to Colby pretty much what I do for a living. I'm an investigator. Okay. And I explained to him at that time that I am right now

-13-

working actually a case of a missing woman and I said, "Man, could you imagine how that family, you being a father, me being a father, you being a brother, or whatever, how could you, could you imagine what it would be like not being able to account for one of your loved ones how that would make you feel." And I can continue on with what he said from there if you'd like, sir.

*Q*. Sure, please do.

*A*. Okay. From that point on, Colby made a statement of, "Yes, she's in Purgatory." And if you'd like me to elaborate on that more, I can, too

*Q*. Well, I think the Judge kind of read the transcripts of, Purgatory was the city or location in St. Joseph County where the body was ultimately found?

*A*. Yes. But I did not know that at first.

*Q*. Right.

*A*. Right.

*Q*. I assume you heard Purgatory, you didn't know what it meant?

*A*. I knew what it meant from my religion.

*Q*. Right, right.

*A*. Yes.

*Q*. So you were thinking something else at the time not a city.

*A*. Yes, I did, I believed—yes, I believed, I thought Cody (sic) then was relating to the religion that I am part of so I was, "You're right, that's probably where I'm going to go, too."

*Q*. So after you were talking to him about, you know, how bad it must, someone in the family must feel, that's when he uttered, "She's in Purgatory."

*A*. He gave a voluntary statement, no direct questioning or anything like that. He's the one that said, "She's in Purgatory."

After defendant made this statement, Det. Walker testified he said something along the lines of "Yep, I'm probably going there, too." Defendant then looked at Det. Walker "strange," and said, "No, Purgatory State Park." Det. Walker had never heard of Purgatory State Park. Det. Walker then clarified, "Are you telling me she's there?" Defendant replied yes. Once Det. Walker realized that defendant's reference to Purgatory was to a location and not the religious concept of souls going to purgatory upon death, he stopped the conversation. A patrol car arrived, defendant was transported to the Sheriff's Department, and there, while still in the patrol car, defendant was read his *Miranda* rights. Defendant then indicated that he wanted to show Det. Walker where the

victim's body was and that he would then like to talk afterwards. Det. Walker agreed that at no point in their encounter would defendant have been free to leave.

On cross-examination by the prosecution, Det. Walker explained that all he intended to do when he approached to speak with defendant was to make him feel "a little bit more comfortable." Det. Walker knew that defendant could be a suspect, but he did not ask defendant if he was the one driving the truck a day earlier, nor did he ask defendant if he had used his phone the day prior. Det. Walker did not ask to see defendant's phone.

Considering the foregoing, we find that defendant made his statements voluntarily and without prompting from the officer. Although defendant was handcuffed and not free to leave, he was placed in the front seat of the unmarked vehicle. Det. Walker testified that he did specifically question defendant about the victim or defendant's contact with her. Nonetheless, defendant voluntarily disclosed the whereabouts of the victim's body. Det. Walker's question was not accusatory, cf. *Barritt*, 325 Mich App at 573, and while it generally appealed to defendant's sympathies, defendant has failed to show it rose to the level of being "reasonably likely to elicit an incriminating response from" him such that it would amount to an interrogation, *Raper*, 222 Mich App at 479. Further, when Det. Walker asked, "Are you telling me she's there," this did not rise to the level of interrogation. " 'Where a statement is spontaneous and only followed with a clarifying question from an officer, it is not given shelter by *Miranda*.' " *People v Lafey*, ____ Mich App ____, ____; ___ NW3d ____ (2024) (Docket No. 361936); slip op at 10, quoting *United States v Corey*, 861 F Supp 2d 1341, 1345 (SD Fla, 2012).

Alternatively, even if the trial court erred when it denied defendant's motion to suppress, it was harmless error beyond a reasonable doubt. The erroneous admission of a confession into evidence is subject to harmless-error analysis. *Lafey*, ____ Mich App at ___; slip op at 9. "Before a constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." *Id.* (quotation marks and citation omitted). That is, "[t]he court must determine, beyond a reasonable doubt, that there was no reasonable possibility that the evidence complained of might have contributed to the conviction." *Id.* (quotation marks and citation omitted). There was overwhelming evidence of defendant's guilt, specifically, that defendant fantasized about necrophilia and sexual contact with incapacitated women, that he prepared and planned to actualize this fantasy, and that on the morning of September 20, 2021, he intentionally killed the victim and engaged in sexual conduct with her body.

The prosecution presented evidence that in the two months before September 20, 2021, defendant searched internet pornography sites, specifically cites that referenced necrophilia and sexual contact with incapacitated women. An hour before defendant's encounter with the victim, defendant was searching the internet for tranquilizer guns. Cellular mapping placed defendant and the victim on 84th Avenue between 8:30 a.m. and 8:50 a.m. on September 20, 2021. Evidence that defendant was traveling below the posted speed limit, that he did not brake before impact, and that impact occurred 10.5 to 13 feet off the roadway supported a finding that when defendant encountered the victim alone on a desolate stretch of road, he intentionally ran her down with his pickup truck.

Additionally, the evidence confirmed that at 9:54 a.m., defendant removed the SIM card from the victim's phone and placed it in a Samsung device. The victim's phone number was now

associated with this phone. From additional cellular data, law enforcement identified defendant's association with that Samsung device. Moreover, between 10:35 a.m. and 5:43 p.m., defendant's phone was using two different cell towers located in Three Rivers. Then, between 5:48 p.m. and 6:04 p.m., defendant's device connected with cell towers in a pattern that suggested he was moving from the Three Rivers cellular towers and, at 6:10 p.m., defendant's cell phone connected with a tower near the car wash in White Pigeon. From defendant's father, law enforcement learned that defendant had been at this car wash in the early evening hours of September 20, 2021. Surveillance video from the car wash captured defendant rinsing blood from his vehicle's floor mats and throwing items in the trashcan. Then, condoms retrieved from the trash can and the interior of defendant's truck provided DNA evidence from which the trier of fact could reasonably conclude that defendant engaged in sexual conduct with the victim's dead body. Moreover, additional items found in defendant's truck, including a mini baseball bat, metal handcuffs, scissors, smelling salts, and testosterone-boosting pills, established defendant's preparation and planning.

In addition to the foregoing evidence, defendant made additional inculpatory statements to officers after he was initially arrested and given his *Miranda* warning, and likewise months later when he was being transported between detention facilities. These inculpatory statements included admissions that he struck the victim with his vehicle and that he used scissors to cut off the victim's shorts and underwear. Indeed, defendant's theory of defense at trial was consistent with his knowledge of the location of the victim's body. Considering the totality of the evidence, defendant's statement regarding the location of the victim's body, while obviously significant for many reasons, was only a minor piece of the puzzle by comparison to the rest of the evidence presented at trial. Accordingly, any error related to the admission of defendant's statement was harmless beyond a reasonable doubt.

Affirmed.

/s/ Philip P. Mariani
/s/ Colleen A. O'Brien
/s/ Randy J. Wallace